UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------X

DAVID BRYANT,

                    Petitioner,

      -against-

JUSTIN THOMAS, SUPERINTENDENT,
MARCY CORRECTIONAL FACILITY,

                 Respondent.

--------------------------------------X

16 Civ. 1330

OPINION AND
ORDER



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/3/17

A P P E A R A N C E S:

Attorneys for Petitioner

W. JAMES COUSINS, P.C.
3 Strawberry Ridge Road
Ridgefield, CT 06877
By:  W. James Cousins, Esq.

PAUL CASTELEIRO, ESQ.
200 Washington Street, 5th Floor
Hoboken, NJ 07030
By: Paul Casteleiro

Attorney for Respondent

THE BRONX DISTRICT ATTORNEY'S OFFICE
198 East 161st Street
Bronx, NY 10451
By:  Noah J. Chamoy, Esq.

**Sweet, D.J.**

Petitioner David Bryant ("Bryant" or the "Petitioner") has petitioned for a writ of habeas corpus seeking to vacate his October 25, 1976, criminal conviction (the "Petition," Dkt. 1). The Petition raises issues concerning the statute of limitation bars set forth in the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2244 ("AEDPA"), the requirements of a claim of actual innocence, and the establishment of a constitutional claim of ineffective counsel in violation of the Sixth Amendment. The difficulties presented to this Court by these always significant and sensitive issues are heightened by the chronology, the Petitioner's confession at the time of his arrest, and the knowledge today of potentially exculpatory serological evidence on which Petitioner now relies.

For the reasons set forth below, it is concluded that Petitioner is entitled to the relief he seeks.

**Prior Proceedings**

a. Pre-Trial Proceedings

On or about April 23, 1975, Petitioner was indicted in Bronx County, New York, of three counts of murder in the second degree, two counts of rape in the first degree, two counts of sodomy in the first degree, sexual abuse in the first degree, and criminal possession of a weapon in the fourth degree. (See Declaration of Noah J. Chamoy dated May 23, 2016 ("Chamoy Decl."), Ex. 1, Dkt. 10.)

On February 4 and 5, 1976, a pre-trial hearing pursuant to People v. Huntley, 15 N.Y.2d 72 (1965), was conducted before the Bronx County Supreme Court with regard to whether to suppress Petitioner's confessions to law enforcement. On June 2, 1976, the court, at Petitioner's request, reopened the hearing for additional testimony in light of People v. Dunaway, 38 N.Y.2d 812 (1975). On June 25, 1976, the court denied Petitioner's motion to suppress. (See Chamoy Decl., Ex. 2.)

## b. Trial Proceedings

Petitioner's trial took place from July 21 to August 2, 1976. (A.457-1184.[1]) Evidence presented at trial by the prosecution and Petitioner included the following testimony.

John Robinson ("Robinson") testified that he was with Petitioner on March 28, 1975, starting at around 1:00 p.m., when they had played basketball. Afterward, Robinson stated they had gone to pick up some bricks to bring to Robinson's house. Robinson estimated he was with the Petitioner for about two hours that afternoon. Robinson then stated he saw Petitioner again at about 6:00 p.m., walking alone across 169th Street and Wassing Avenue, though they did not talk at that time. After that, Robinson did not see Petitioner the rest of the evening. (See A.515-16.) According to Robinson, the last time he saw Petitioner, Petitioner was wearing the same clothes he had had worn while playing basketball, light color pants and a sweatshirt with writing on it. (See A.519.)

---

[1] Citations to "A." and then a page number refer to the Appendix compiled by the Respondent during the appeal of Petitioner's New York State 440.10 motion and submitted by Respondent for the instant petition.

John Friedman ("Friedman") testified that that same day, between 4:00 and 5:00 p.m. on 166th Street and Findley Avenue, he saw Petitioner. Friedman stated that he spoke to Petitioner for "about 20 minutes." (A.505-06, A.508.) According to Friedman, while speaking to Petitioner, Friedman observed that Petitioner had a knife in a leather holster on his belt. (See A.505-06, A.508-11, A.513-14.)

Ricky Frazier ("Frazier"), a friend of Petitioner's, testified he saw Petitioner and Friedman together on 167th Street and Findley Avenue around 3:30 p.m. but that the two were arguing. Frazier stated he had to separate them by grabbing Petitioner around the waist; Frazier noted that he did not see or, while grabbing Petitioner, feel a knife on Petitioner's belt at that time. (See A.520-21.)

Frazier testified that, after separating Friedman and Petitioner, Petitioner and he went to Frazier's girlfriend's house. Petitioner remained there until around 4:00 or 4:15 p.m. and then left. (See A.520-21.) According to Frazier, Petitioner was wearing white pants, a sweatshirt with writing on it, a gray coat, and sneakers. Frazier said he did not observe Petitioner in possession of a knife. (See A.521-22, A.528, A.849.)

4

Billy Tylor ("Tylor"), a then-ten-year-old neighbor of Petitioner's, testified that he saw Petitioner twice on March 28.[2] First, sometime prior to dinner, Tylor saw Petitioner ask Karen Smith ("Smith") for some candy, to which she replied no. Second, sometime after eating dinner that evening, Tylor returned downstairs to see Bryant and Smith in front of the building. (See A.536-38.) Tylor stated that Petitioner was wearing white pants and a grayish sweatshirt. At some point thereafter, Tylor saw Smith go across the street to a corner store and, at some point after that, saw Petitioner go around the corner as well. After waiting for some time, during which time Smith did not return, Tylor went back inside to his apartment. (See A.539-41.)

At about 7:00 p.m. that evening, Smith's mother, Christine Smith ("C. Smith"), called home from work. C. Smith's son informed her that Smith was not home. At approximately 10:10 p.m., upon returning home from work, C. Smith discovered that her daughter was still not home. C. Smith called a neighbor and

---

[2]    At trial the last name was spelled "Tylor," though in affidavits submitted since, the name has been spelled "Tyler." (See Chamoy Decl., Ex. 27; Petition, Ex. 4 at 2 n.2.) Given that the parties continue to spell the name Tylor, for consistency and the avoidance of confusion, Tylor will continue to be used.

5

had her sons go search for Smith. Still unable to locate Smith by around midnight, C. Smith reported that Smith was missing to the police. (See A.480-82.)

At around 11 p.m., Michelle Lapsley ("Lapsley"), Petitioner's ex-girlfriend, testified that she spoke with Petitioner. Petitioner and Lapsley spoke for about fifteen minutes, during which time Petitioner sounded nervous and told Lapsley that he "did something" with a girl, but did not elaborate further. (A.645.)

At approximately 1:45 a.m. on the morning of March 29, after learning of Smith's disappearance, Police Officer John Robinson ("Robinson") went towards the roof at 1285 Washington Avenue and stopped at the stair landing of the sixteenth floor. Robinson testified that the floor was dark and the lightbulb in the fixture on the landing was loose; when tightened, the light still did not work. As Robinson approached the top of the landing, he observed Smith's body on the landing, at which point she was wearing only socks and panties. A pair of sneakers, several articles of clothing, a white blood-stained garment, and a "Nestles $100,000 Bar" wrapper were also found near the body. Blood was on the wall of the landing, extending three or four

feet high. (See A.491-96, A.499-501, A.663, A.666-67, A.815-16.)
Police officers testified that tests of the area also found
blood on the stair's step landing. The landing wall was not
tested for the presence of blood but was dusted for
fingerprints, as was the landing door; partial prints were
obtained from the wall. (See A.662-63.) The partial prints did
not have enough characteristics to make an identification. (See
A.670-72.)

Dr. Josette Montas ("Montas") performed Smith's autopsy on
March 29, 1975. Montas testified that Smith was stabbed 10
times. Some of the wounds were defensive in nature and located
along Smith's left arm; two wounds were inflicted on Smith's
neck, one was on the back of Smith's thigh, and four were into
Smith's chest. One of the chest wounds penetrated Smith's chest
cavity and pierced her heart. (See A.737-40, A.746-47, A.797-
99.) Smith's body had "a few [four] scratches we call abrasions
of the skin . . . over the back measuring each a half inch."
(A.741.) Montas stated that all of the stab wounds contributed
to Smith's death, but the one wound to the right side of the
chest "went deeper in the lung and heart would be a good
contributing factor." (A.740.) Montas also testified that Smith
had "fresh" lacerations of her rectum and vagina, which Montas

7

believed were consistent with being caused by the insertion of a penis. (See A.741-43.)

Police Officer Richard Clark ("Clark"), whose police patrol beat included the housing complex in which Petitioner lived, testified that, sometime on March 29 after Smith's body had been found, Clark spoke with Detective Peter Chapman ("Chapman"), who had arrived at the crime scene around 3:45 a.m.. Clark told Chapman that he had, at times in the past, seen Petitioner on the same steps where Smith's body had been found. (See A.806-11, A.817.)

Denise Friedman ("D. Friedman"), Friedman's then-sixteen-year-old daughter and Petitioner's then-girlfriend, testified that she spoke with Petitioner twice over those days. The first time was the evening of March 28 sometime between 7 and 7:30 p.m., when Petitioner told her that he was going out. (A.888.) The second time was on March 29 around 7 a.m., when she briefly called Petitioner after having breakfast. During that conversation, Petitioner told D. Friedman that he just did something to a girl, although Petitioner did not elaborate and D. Friedman did not inquire further. (See A.886-88.)

As to D. Friedman's second conversation, Willie Craig ("Craig"), Petitioner's stepfather testified differently. Craig testified that there were no phone calls at Petitioner's apartment the morning of March 29, a fact he stated he would have known because the only phone was kept in his bedroom and there were no line extensions. (See A.969-71.)

Around 8:30 a.m. on March 29, after speaking with Clark, Chapman and a few other police officers went to Petitioner's apartment. Upon arriving, the police found Petitioner in his underwear and a tee-shirt; the officers requested that Petitioner get dressed in the same clothes he had worn the evening before, at which point Petitioner put on a gray coat, a gray sweatshirt with "Lehman College" written on it, white pants, and sneakers. Police asked if Petitioner would accompany them to the South Bronx Housing Precinct to assist in their investigation of Smith's death. Petitioner agreed. The police read Petitioner his Miranda rights and escorted him to the precinct. (See A.549, A.574, A.818-20, A.827, A.919-20.)

Upon arriving at the precinct, Petitioner was led by Chapman to the precinct's "Processing Room" and read his Miranda rights again, which Petitioner waived. (A.821-22.) Petitioner

remained at the precinct over the course of the day, during which he was first interrogated by several officers, including Chapman, Officer Adrian Smith ("A. Smith"), and Officer Antonio Jimenez ("Jimenez"). (See A.560; A.821.) Petitioner initially and repeatedly maintained his innocence; he also denied knowing Smith or, even after seeing a picture of her, knowing her. (See A.560; A.623-24.) At this time, Petitioner described the events of March 28 as follows: from around 2:30 p.m. until around 7 p.m., Petitioner was with friends; from around 7 p.m. until around 10 p.m., Petitioner was outside by himself; and from 10 p.m. until around 2:30 a.m., Petitioner went home, ate a pork chop sandwich, watched television, and went to bed. (See A.571-74.)[3]

Around 7:15 p.m. the evening of March 29, Detective Sergeant William Brent ("Brent") testified that he arrived at Petitioner's interrogation room. Testimony differed as to what happened next. Petitioner testified that, at this point, Brent and other officers described to Petitioner details of the crime, physically assaulted Petitioner by grabbing him, throwing him onto the floor, and kicking him, and ultimately forcing him to

_____

[3]     Police later searched trash cans around Petitioner's building and were unable to locate any pork chop bones. (See A.611.)

10

confess. (See A.921-23.) Brent testified differently, stating that, after a discussion with the Petitioner about "what had occurred" during the crime, Brent asked Petitioner to cooperate, at which point Brent read Petitioner his Miranda rights again, which Petitioner waived. (See A.679-80.)

Petitioner then confessed. Specifically, Petitioner confessed that he saw Smith in the lobby of their building and that he knew her by sight, but not by name. After getting into the elevator together, Petitioner asked Smith if she wanted to have sex, to which she replied she did not know. Petitioner told Smith not to be afraid, and he led her upstairs to the landing on the sixteenth floor. (See A.680-81.) There, Petitioner confessed that he unscrewed the lightbulb, took off Smith's clothes, "dropped [his] pants," and had intercourse with her. (A.681.) Petitioner stated he did not "remember" sodomizing her and, afterward, got hot and nervous, began to "shake all over," and then grabbed and shook Smith. (A.681-82.) Petitioner stated that he then "came to" on a park bench outside with a knife. (A.682.)

Assistant District Attorney Edward Haynes ("Haynes") testified that he arrived at the precinct around 9 p.m. and

11

questioned Petitioner. Petitioner confessed twice more to Haynes, with largely the same details, except Petitioner then confessed that he recalled feeling a knife in his pocket after having sex with Smith, that he ejaculated near but not in Smith, that he threw Smith against the wall after intercourse, and that Petitioner disposed of the knife in a trash can after "coming to" in a park sometime after his encounter with Smith. (See A.837-38; 842-67.) While confessing to Haynes, Petitioner was unable to describe the clothes that Smith was wearing. (A.846.) Petitioner also claimed he was wearing the same pants at that time that he was wearing while he was with Smith the previous evening, (A.847), stated that he did not pull back up Smith's underwear after intercourse, (A. 866), and denied calling D. Robinson at any point afterward, (A.854.)

Petitioner testified in his own defense. In his testimony, Petitioner stated that on March 28, he wore white pants, a white sweatshirt, blue sneakers, and a jacket. At trial, Petitioner's testimony as to his activities on March 28 mirrored that which he told Chapman, A. Smith, and Jimenez when Petitioner first arrived at the police precinct. Petitioner testified that he did not own a knife. He also stated he knew Smith and had thrown glass at her about a year before, but that he was not guilty of

the alleged crimes and only confessed after being physically assaulted. (See A.919-30.) Petitioner also admitted that he had asked Frazier in a letter to provide Petitioner a false alibi for between 7 and 9 p.m. the evening of March 28. (See A.935-37.)

The prosecution also submitted serological evidence collected from the crime scene, which was testified to by Dr. Alexander Wiener ("Wiener"), the prosecution's expert serologist. Wiener testified that he examined Smith's vaginal and rectal areas and did not find evidence of semen. After examining Smith's blood-stained underwear, Wiener stated that "there probably is human semen on this garment together with blood." (A.721; see also A.718-22.) Wiener noted that part of the stained underwear area "gave a strong reaction in the acid phosphate [*sic*] test," which he said was "a presumptive test for semen" and that he was able to identify the head of "at least one" sperm cell in the sample.[4] (A.721.) The acid phosphatase

---

[4] Acid phosphatase is an enzyme found in all human tissue and is in very high levels in semen. Semen is comprised of two parts: a liquid part, which contains acid phosphatase, and a solid part, which contains cells. A strong, positive test for acid phosphatase usually indicates the presence of semen, but it is additionally necessary to identify sperm to conclusively prove semen is present. (See A.1452-53.)

13

test in Smith's vagina, mouth, and rectum came back with a weak reaction. (A.729-30.)

Wiener testified that he had tested Smith's blood type and determined she had type O blood. Wiener did not conduct any tests to determine whether Smith was a secretor or a non-secretor.[5] Wiener found the sample from the underwear reacted for type O blood, but he was unable to determine whether the typing was from the blood or semen collected on the underwear. (See A.722; A.1632.) Wiener also tested Petitioner's gray coat for blood and found a spot on the coat that he was "almost surely" blood, though Wiener was unable to determine whether the blood was from a human or, for example, from meat. (See A.722-23; A.725.) Aside from the coat blood stain, Wiener found "no stains resembling blood" on any of Petitioner's clothes. (A.724.)

---

[5]    A secretor is a person whose blood type, or antigens, can be detected in her body fluids, such as semen or saliva. A non-secretor's antigens cannot be detected. A body fluid can be tested to determine if a donor is a secretor or a non-secretor. (A.1466-67; A.1631-32.) If a person is a secretor and has blood type A, an "A" antigen is detectible; if blood type B, an "B" antigen is detectible; if blood type O, only an "H" antigen is detectible. In other words, all blood types have the "H" antigen, but blood type O has only the "H" antigen. (See A.1465-66.) Approximately 80% of the population are secretors and 20% non-secretors. (See A.1466-67.)

14

During Wiener's cross-examination, Petitioner's trial counsel, Paul Auerbach ("Auerbach"), asked to see the reports Wiener referred to on direct examination. Upon receipt of the reports, Auerbach requested "a minute" to review them. Shortly thereafter, Auerbach asked Dr. Wiener two questions with regard to Wiener's blood typing analysis: if it was "correct that the blood types are A, B and O" and, as a follow-up, if "there [is] a blood type called 'H'?" (A.726-27.) Auerbach otherwise examined Wiener on Wiener's analysis of the sperm on the sample collected, analysis on the blood sample from Petitioner's jacket, and analysis of the swabs taken from Smith's body. (See A.725-31.)

On October 25, 1976, Petitioner was found guilty on all counts, though the sexual abuse and criminal possession of a weapons charges were later dismissed by the state court. (See A.1155-56; 1170; 1182.) Petitioner was sentenced to three indeterminate terms of imprisonment from 25 years to life for the murder counts and four indeterminate terms of imprisonment from 8 1/3 to 25 years on the sexual assault charges. All sentences were to run concurrently except for one sentence imposed for first-degree sodomy, which was to run consecutively to the murder sentence. (See A.1170-83.)

15

c. Post-Trial Proceedings

On July 10, 1979, on appeal, the New York First Department affirmed Petitioner's conviction in a three to two decision. People v. Bryant, 71 A.D.2d 564 (1st Dep't 1979). On August 16, 1979, the First Department granted leave to appeal to the New York Court of Appeals, (Chamoy Decl. at ¶ 11), which, on June 24, 1980, unanimously affirmed Petitioner's conviction and, inter alia, upheld the lower court's finding that Petitioner's confession was not involuntarily obtained, People v. Bryant, 50 N.Y.2d 949, 950 (1980). On November 3, 1980, the United States Supreme Court denied Petitioner's petition for a writ of certiorari. Bryant v. New York, 449 U.S. 958 (1980).

On August 12, 2005, Petitioner, acting *pro se*, filed a Freedom of Information Law ("FOIL") request, pursuant to New York Public Officers Law § 84 *et seq.*, with the Office of the District Attorney, Bronx County ("Bronx DA"). The Bronx DA located an incomplete appeals folder containing only Respondent's Brief on appeal in the First Department and Petitioner's Brief and Appendix in the Court of Appeals, both of which Petitioner received on July 10, 2006. Petitioner filed similar FOIL requests with the New York City Police Department

16

("NYPD") and, on May 31, 2017, filed a civil action seeking an order directing the NYPD to provide Petitioner with access to records pertaining to the Smith investigation. (See Chamoy Decl., Ex. 6; id. at ¶¶ 16-17.)

In July 2008, Petitioner and the NYPD entered into a Stipulation of Settlement, providing Petitioner with certain paperwork from the NYPD file, including several photographs, a one-page request for Laboratory Examination dated April 1, 1975, and a one-page memorandum dated July 23, 1976. (See Chamoy Decl. at ¶ 18.) Around this time, Petitioner also received a copy of his pretrial hearing and trial transcripts. (See id. ¶ at 19.)

Around February 2009, Petitioner's current counsel contacted the Bronx DA and requested assistance in locating certain serological evidence relating to Petitioner's case. Multiple request were made to the New York Office of Chief Medical Examiner ("OCME") and the NYPD. At that time, both offices were unable to locate property associated with Petitioner's case. (See Chamoy Decl. at ¶ 20.)

Around June 2010, Petitioner's counsel requested that the Bronx DA produce Petitioner so he could have saliva samples

analyzed for blood typing and secretor status comparison. In July 2010, an independent laboratory conducted ABO blood typing and secretor status testing of Petitioner's sample and provided its results both to the Petitioner and Bronx DA. (See Chamoy Decl. at ¶ 21.) Petitioner was determined to have a B blood type and to be a secretor. (Chamoy Decl., Ex. 8 at Ex. 6.)

On April 12, 2011, Petitioner moved in Bronx County Supreme Court pursuant to N.Y. Criminal Procedure Law ("NYCPL") § 440.10(1)(h) to vacate his judgment of conviction on the grounds that (1) the recently-obtained blood-typing evidence establishes his actual innocence and (2) he received the ineffective assistance of trial counsel due to counsel's alleged failure in 1975 to investigate and determine Petitioner's blood type and secretor status and to consult with a serologist. In a supplemental motion, dated October 3, 2011, Petitioner maintained, as he had on direct appeal, that any statements obtained from him following his arrest were coerced and false. (See Chamoy Decl. at ¶ 22.)

On August 13 and 14, 2012, a post-conviction Section 440.10(1)(h) hearing was ordered concerning the serology evidence and held at the Bronx County Supreme Court. Petitioner

called one expert witness, Dr. Robert Shaler ("Shaler"), a retired Director of the Forensic Biology Laboratory at OCME. Respondent called one expert witness, Marie Samples ("Samples"), the Assistant Director at the same OCME lab. (See Chamoy Decl. at ¶ 23; A.1431-671.) After reviewing Wiener's bench notes[6] and testimony, Shaler testified that the finding of a sperm head and the strong reaction to acid phosphatase in Smith's underwear suggested there was a significant amount of semen present to type the blood type of the semen donor; because of Smith's young age and the unlikelihood of significant vaginal secretions in combination with the high probability of her being a secretor, Shaler concluded the serological evidence excludes Petitioner. (See A.1651-54.) Samples rejected the assumptions that Smith was a secretor and that there was enough antigen in the fluid analyzed to determine the blood type of the semen donor; Samples concluded that the new serological evidence was inconclusive and had no weight. (See A.1566-71, A.1615.)

On December 17, 2012, the Bronx County Supreme Court issued an interim decision that ordered the hearing reopened to hear from Petitioner's trial counsel, Auerbach, to determine whether

---

[6]     Bench notes are "contemporaneous markings of a laboratory technician indicating the results that are obtained during testing." (A.1448.)

counsel's failure to determine Petitioner's blood type and secretor status, consult with a serologist, and adequately prepare to meet the People's serological evidence constituted ineffective assistance of counsel. (See Chamoy Decl., Ex. 20.) On January 10, 2013, the reopened Section 440.10 hearing was conducted, and Auerbach was examined by counsel. (See A.1737-71.) At the hearing, Auerbach could not recall anything about Petitioner's trial from memory or the number of homicide cases he had conducted. After reading the trial transcript, Auerbach stated that there was no strategic reasons for not having Petitioner's blood type determined or for his decision not to consult with a serologist. (See A.1748, 1750, 1752-53, 1755.) Auerbach testified that serology was not on his "radar" at the time. (A.1752.)

On April 11, 2013, the Bronx County Supreme Court granted Petitioner's Section 440.10 motion to vacate the judgment of conviction upon a finding of ineffective assistance of trial counsel. People v. Bryant, 41 Misc.3d 554 (Sup. Ct. Bx. 2013). The court stated that, "In light of finding that trial counsel was ineffective, it is not necessary to decide [Petitioner's] claim of actual innocence." Bryant, 41 Misc.3d at 571. The Bronx DA appealed on January 15, 2014. (Chamoy Decl. at ¶ 28.)

On June 19, 2014, the New York First Department "unanimously modified, on the law," the order granting Petitioner's Section 440.10 motion to vacate his judgment of conviction by denying "that portion of the motion seeking vacatur on ineffective assistance of counsel grounds" and "remand[ing] to determine the remaining branch of [Petitioner's] motion" not already considered. People v. Bryant, 118 A.D.3d 576 (1st Dep't 2014).

On June 26, 2014, Petitioner applied for a certificate granting leave to appeal from the New York Court of Appeals on the grounds that he received ineffective assistance of trial counsel. (Chamoy Decl., Ex. 26.) On August 21, 2014, the New York Court of Appeals, denied Petitioner's application for leave to appeal. People v. Bryant, 23 N.Y.3d 1060 (2014).

On September 24, 2014, Petitioner moved to vacate the judgment of conviction on the grounds of actual innocence, principally based on an affidavit from Billy Tylor which recanted Tylor's earlier testimony, an affidavit from Dr. Saul Kassin ("Kassin"), a social psychologist who Petitioner sought to admit as an expert on police interrogation techniques, and

the serological evidence. (See Chamoy Decl. at ¶ 32; see also
Petition, Ex. 4.) On February 11, 2015, the Bronx County Supreme
Court denied Petitioner's motion. (See Petition, Ex. 4.)

On March 16, 2015, Petitioner applied for leave to appeal
from that denial in the First Department, which was denied on
July 28, 2015. See People v. Bryant, Motion No. M-1104, 2015
N.Y. Slip Op. 80122(U) (1st Dep't 2015); (Chamoy Decl. at ¶¶ 34-
35).

The instant petition was submitted on February 18, 2016,
(Dkt. 1), and was heard and marked fully submitted on February
16, 2017.

**Applicable Standard**

Section 2254 of the AEDPA provides a federal remedy for
state prisoners if their continued custody is in violation of
federal law. 28 U.S.C § 2254(a); see Chandler v. Florida, 449
U.S. 560, 571 (1981) ("This Court has no supervisory authority
over state courts, and, in reviewing a state court judgment, we
are confined to evaluating it in relation to the Federal
Constitution."). Errors of state law are not cognizable on

22

federal habeas review. Estelle v. McGuire, 502 U.S. 62, 71-72 (1991). Petitioners bear the burden of proving violations of federal law by a preponderance of the evidence. See Epps v. Poole, 687 F.3d 46, 50 (2d Cir. 2012).

A state court's adjudication as to whether a defendant's constitutional rights have been violated may be overturned only if it either:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

8 U.S.C. § 2254(d)(1)-(2); see Williams v. Taylor, 529 U.S. 362, 375-76 (2000).

With respect to the "contrary to" clause, the writ may issue in two circumstances: first, if the state court decision "applies a rule that contradicts the governing [Supreme Court] law"; and second, if the state court decision addresses a set of facts "materially indistinguishable" from a relevant Supreme Court case and arrives at a result different to that reached by the Court. Lockyer v. Andrade, 538 U.S. 63, 73 (2003) (quoting

23

Williams, 529 U.S. at 405-06). The "clearly established Federal law" refers to Supreme Court holdings, as opposed to the *dicta*, as of the time of the relevant state court decision. See Williams, 529 U.S. at 412. A state court decision involves an "unreasonable application" of Supreme Court precedent when the state court either "identifies the correct governing legal rule" from the Supreme Court's cases but "unreasonably applies it to the facts" of the case, or "unreasonably extends a legal principle from [the Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id. at 407.

Under the "unreasonable application" clause, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411. "Rather, it is the habeas applicant's burden to show that the state court applied [Supreme Court precedent] to the facts of his case in an objectively unreasonable manner." Woodford v. Visciotti, 537 U.S. 19, 25 (2002). Determinations of factual issues made by a state court must be presumed correct unless the petitioner can show by clear

and convincing evidence that such presumption should not apply. See 28 U.S.C. § 2254(e)(1).

In addition, the Supreme Court's jurisprudence on the "unreasonable application" clause of § 2254(d)(1) makes "clear that whether a state court's decision was unreasonable must be in light of the record the court had before it." Holland v. Jackson, 542 U.S. 649, 652 (2004). "If a claim has been adjudicated on the merits by a state court, a federal habeas Petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." Cullen v. Pinholster, 563 U.S. 170, 184 (2011).

The AEDPA imposes a 1-year statute of limitations on all applications for a writ of habeas corpus brought by a person in custody pursuant to the judgment of a state court. 28 U.S.C. § 2244(d)(1); Holland v. Florida, 560 U.S. 631, 634 (2010). The one-year period of limitation to seek a writ of habeas corpus is the latest of:

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is

25

removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim . . . presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

The AEDPA limitations period is not jurisdictional and can be tolled equitably in appropriate cases. See Holland, 560 U.S. at 645; Smith v. McGinnis, 208 F.3d 13, 17 (2d Cir. 2000). Equitable tolling requires a petitioner to show that (1) he has been pursuing his rights diligently and (2) some extraordinary circumstance stood in his way and prevented timely filing. Holland, 560 U.S. at 649. Similarly, a prisoner can circumvent the AEDPA limitations period if he or she makes "a credible showing of actual innocence." McQuiggin v. Perkins, 133 S.Ct. 1924, 1931 (2013).

**Petitioner's Statute Of Limitations Under The AEDPA Has Expired**

As a threshold matter, Petitioner's habeas claim must first survive the statute of limitation as provided by the AEDPA, as described above. Petitioner contends that his petition is timely under Section 2244(d)(1)(D) because he filed his claim within one-year of discovering the "factual predicate" of his claim, specifically the laboratory notes and serological testing performed on the sample found on Smith's underwear. (Petition at 14-15.) Petitioner contends that, even with "due diligence," he could not have been discovered and analyzed these information any sooner than he did in combination with the help of his current counsel, in part because of Petitioner's low I.Q. level. (See id.) Petitioner's argument is unavailing.[7]

Section 2244(d)(1)(D) "resets the limitations period's beginning date, moving it from the time when the conviction

---

[7] The remaining prongs of Section 2244(d)(1) are inapplicable to Petitioner's case. Sections 2244(d)(1)(B) and (C) are inapplicable because Petitioner is not claiming that some state action impeded him from seeking habeas relief or that his is an issue involving retroactive application of a constitutional right later recognized by the Supreme Court. Section 2244(d)(1)(A) is inapplicable because, even though Petitioner was convicted prior to the effective date of the AEDPA and received a one-year grace period to file his habeas petition, that period expired on April 24, 1997. See Carey v. Saffold, 536 U.S. 214, 217 (2002).

became final . . . to the later date on which the particular claim accrued." Ocasio v. Lee, No. 14 Civ. 6097 (JMF), 2017 WL 456468, at *3 (S.D.N.Y. Feb. 2, 2017) (citation omitted). "The determination of the date on which the factual predicate for a habeas claim is first discoverable is a 'fact-specific' inquiry which requires a district court to analyze the factual bases of each claim and to determine when the facts underlying the claim were known, or could with due diligence have been discovered." Rivas v. Fischer, 687 F.3d 514, 534 (2d Cir. 2012). To determine if facts could have been discovered through the exercise of due diligence, a district court needs to evaluate "when a duly diligent person in [the] petitioner's circumstances would have discovered" those facts. Wims v. United States, 225 F.3d 186, 190 (2d Cir. 2000). Evidence is not newly discovered simply because a petitioner did not possess it until recently; if evidence could have been obtained earlier, "the date when the evidence was actually obtained has no effect on the AEDPA limitations period." Duamutef v. Mazzuca, No. 01 Civ. 2553 (WHP) (GWG), 2002 WL 413812, at *9 (S.D.N.Y. Mar. 15, 2002) (citing Sorce v. Artuz, 73 F. Supp. 2d 292, 298 (E.D.N.Y. 1999)).

Petitioner filed state post-collateral relief seeking to vacate his judgment on April 8, 2011, which became final when

28

his leave to appeal was denied on July 28, 2015. (Chamoy Decl. ¶¶ 22, 35.) Petitioner filed his habeas claim on February 28, 2016. (See Petition at 16.) Assuming the underlying state collateral action was proper, such action would toll Petitioner's limitations period. See 28 U.S.C. § 2244(d)(2). The question presented here is whether, with due diligence, Petitioner could have discovered the serological evidence upon which his petition relies one year prior to his instant habeas petition, which was filed on February 18, 2016. Working backwards timewise and excluding tolled time places the cutoff date at November 19, 2010.

As described above, Petitioner's trial occurred in 1976, during which the prosecution presented serological evidence against Petitioner, including laboratory reports upon which Petitioner relies today; it was testified to by one of the prosecution's witnesses, who was also cross-examined by Petitioner's counsel. Wiener's final serological reports were admitted into evidence as a trial exhibit for the prosecution. (See A.718-34.) As such, even prior to his conviction, Petitioner was aware that serological evidence existed and was relevant to his conviction. Nevertheless, Petitioner took no further action with regard to seeking out additional information

29

about the serology records, including his own blood type, until July 2005, when he filed a FOIL request. (See Chamoy Decl., Ex. 6.) That is an almost thirty-year time gap during which a diligent defendant would have done something to investigate the serological evidence further. Petitioner's failure to do so is the opposite of establishing due diligence. See Landrum v. Mitchell, 625 F.3d 905, 924 (6th Cir. 2010) (finding petitioner's newly submitted affidavit was based on "factual predicate" known at time petitioner's post-conviction appeal because it attacked evidence presented at initial trial).

Even assuming Petitioner is in fact limited by a low I.Q.—the exact limitations of which are not conclusively established by the record[8]—it is of no moment in finding Petitioner's claim untimely. Due diligence is an "objective test" that considers the "conditions of [petitioner's] confinement." Wims, 225 F.3d at 190-91 & n.4. It is not for a district court to consider

---

[8]   Petitioner has put forward evidence of an in-patient evaluation conducted in 1975 to determine whether Petitioner was competent to stand trial that concluded that Petitioner's full scale I.Q. was 71. (See Chamoy Decl., Ex. 2 at 8.) Respondent notes that the same report also stated that Petitioner's "motivation with respect to the tests was limited" and that Petitioner "tried to manipulate the examiner to his own advantage." (Id.) The state court accepted that Petitioner's I.Q. was 71 but nevertheless still found that his confession was voluntary and could not be suppressed. (See id. at 10, 17.)

subjective factors like a "petitioner's intelligence, education, language skills, or mental stability." Reyes v. Mance, No. 09 Civ. 2066 (CM), 2010 WL 1737806, at *6 n.5 (S.D.N.Y. Apr. 23, 2010) (quoting Gonzalez-Ramos v. United States, No. 05 Civ. 3974 (LAP), 2007 WL 1288634, at *7 (S.D.N.Y. May 2, 2007)). What matters is "when the prisoner knows (or through diligence could discover) the important facts, not when the prisoner recognizes their legal significance." Id. (citation omitted).

As noted above, Petitioner knew that serological evidence was collected and used by the prosecution to convict him back in 1976. Petitioner's intelligence is a non-considerable factor; rather, what matters is the lack of demonstrated diligence in or impediments to securing further information for Petitioner's use in attacking his conviction earlier than his 2005 FOIL request. Accordingly, under the strictures of Section 2244(d)(1)(D), that avenue for habeas relief is closed to Petitioner.

**Petitioner's "Actual Innocence" Claim Permits Equitable Tolling Of His Habeas Claim**

Petitioner has put forward an alternative to justify consideration of his otherwise untimely petition: a showing of his actual innocence. Respondent argues that Petitioner's claim of actual innocence was already rejected by a state court and that Petitioner has failed to show, by clear and convincing evidence, that the state court's finding was in error pursuant to Section 2254(e)(1). Here, however, Petitioner's argument succeeds.

"[H]abeas corpus is, at its core, an equitable remedy." Schlup v. Delo, 513 U.S. 298, 319 (1995). Accordingly, the Supreme Court has held that in "appropriate cases," principles of comity and finality "must yield to the imperative of correcting a fundamentally unjust incarceration." Engle v. Isaac, 456 U.S. 107, 135 (1982). As such, the Supreme Court has recognized that an assertion of actual innocence will excuse a federal habeas petitioner from a procedural bar or the expiration of the one-year statute of limitations proscribed by 28 U.S.C. §2244(d)(1) if a presented actual innocence claim is " 'credible' and 'compelling' . . . allowing a petitioner to have his otherwise time-barred claims heard by a federal court."

Rivas v. Fischer, 780 F.3d 529, 545 & n.25 (2d Cir. 2015)
(citing McQuiggin, 133 S.Ct. at 1928); see also Rivas, 687 F.3d
at 541.

"For the claim to be credible[,] it must be supported with
new reliable evidence-whether it be exculpatory scientific
evidence, trustworthy eyewitness accounts or critical physical
evidence-that was not presented at trial." House v. Bell, 547
U.S. 518, 521 (2006) (quoting Schlup, 513 U.S. at 324). Provided
a petitioner has presented "some new reliable evidence," the
court may proceed to the "compelling" prong of the claim, at
which point the court's analysis "is not limited to [new
reliable] evidence" but must be based on "all the evidence, old
and new." House, 547 U.S. at 537 (internal quotation marks
omitted); see also Rivas, 687 F.3d at 542. For the claim to be
"compelling," it must "demonstrate that more likely than not, in
light of the new evidence, no reasonable juror would find him
guilty beyond a reasonable doubt-or, to remove the double
negative, that more likely than not any reasonable juror would
have reasonable doubt." House, 547 U.S. at 538; see McQuiggin,
133 S.Ct. at 1933 (reiterating standard); Rivas, 687 F.3d at 518
(employing the same). The actual innocence claim allows district
courts to consider evidence beyond what was presented at the

petitioner's trial—in the Court's words, "all the evidence,"
without regard to whether it would necessarily be admitted under
"rules of admissibility that would govern at trial—"to assess
how reasonable jurors would react to the overall, newly
supplemented record." Schlup, 513 U.S. at 327-28, 330. After
considering of all the evidence, the district court must make a
"probabilistic determination about what reasonable, properly
instructed jurors would do. Id. at 329. While demanding,
Petitioner's burden to shown actual innocence "does not require
absolute certainty about the petitioner's guilt or innocence."
House, 547 U.S. at 538.

Before considering whether Petitioner's actual innocence
claim meets the "more likely than not" standard articulated by
the Supreme Court, Respondent's contention as to the weight of
the state court's earlier finding and rejection of Petitioner's
actual innocence claim must be addressed. As described above,
the New York Supreme Court, on remand from the New York
Appellate Division, First Department, rejected Petitioner's
actual innocence argument in the process of denying Petitioner's
motion for a full hearing to determine the merits of that claim,
holding that Petitioner "failed to make a *prima facie* showing of
innocence to warrant a hearing." (Petition, Ex. 4 at 17.) The

state court's opinion also repeatedly noted that different pieces of evidence presented by Petitioner did not demonstrate "clear and convincing evidence" to support his claim of actual innocence. (See Petition, Ex. 4 at 14-16.) Respondent argues this decision is a finding of fact, entitling it to deference under AEDPA. Petitioner argues that because the state court stated that Petitioner needed to show actual innocence by a "clear and convincing" standard, the incorrect standard under McQuiggin, that court's decision should be entitled to no deference.

Neither position fully addresses the present issue. First, although the precise interplay between Sections 2254(e)(1) and 2254(d)(2) has not been clearly articulated by the Supreme Court, the Court has indicated that "[Section] 2254(e)(1) 'pertains only to state-court determinations of factual issues, rather than decisions [i.e., adjudications][,]' while [Section] 2254(d)(2) 'contains the unreasonable requirement and applies to the granting of habeas relief . . . ." Ebrahim v. LeConey, No. 10 Civ. 6397 (MAT), 2012 WL 6155655, at *20 (W.D.N.Y. Dec. 11, 2012) (quoting Miller-El v. Cockrell, 537 U.S. 322, 341-42 (2003)) (alterations in original); see also Wood v. Allen, 558 U.S. 290, 300 (2010) (observing that the

35

Supreme Court has "explicitly left open the question whether § 2254(e)(1) applies in every case presenting a challenge under § 2254(d)(2)" but denying habeas claim because state court's factual determination that counsel "made a strategic decision not to pursue or present evidence" was not unreasonable under Section 2254(d)(2)). "AEDPA does not require [a] petitioner to prove that a decision is objectively unreasonable by clear and convincing evidence." Miller-El, 537 U.S. at 341-42.

The confusion here seems to stem, in part, from overlapping standards of actual innocence between the state court proceeding and Petitioner's instant petition. In denying Petitioner's motion for an actual innocence hearing, the state court considered whether Petitioner's factual showing had met the legal threshold under New York law to sustain a freestanding claim of actual innocence. (See Chamoy Decl., Ex. 4 at 11); see also People v. Hamilton, 115 A.D.3d 12, 26-27 (2014) (holding that a "freestanding claim of actual innocence may be addressed pursuant to CPL 440.10(1)(h)" if a defendant can show actual innocence by "clear and convincing" standard). Freestanding claims of actual innocence have not been defined at the federal level yet; rather, as noted above, claims of actual innocence act as gateways to permit petitioners to argue constitutional

violations in opposition to established claims of untimeliness. See Hamilton, 115 A.D.3d at 21-22 ("The Federal courts have not resolved whether a prisoner may be entitled to habeas corpus relief based upon a freestanding claim of actual innocence."). Thus, Petitioner is incorrect in stating that the state court's applied the wrong standard in finding that Petitioner failed to make a *prima facie* showing to merit a hearing on his actual innocence claim—that was the right standard. See, e.g., People v. Griffin, 120 A.D.3d 1257, 991 N.Y.S.2d 896 (2nd Dep't 2014) (citations omitted). However, it was the right standard for a different question. Furthermore, it does not address the matters of deference as stated under the AEDPA: namely, which portions of the state court's decision are findings of fact, and therefore entitled to clear and convincing deference under Section 2254(e)(1), and which are decisions, and therefore entitled to a different level of deference under Section 2254(d).

Upon examination of the state court's opinion, the following distinctions can be drawn. First, the state court's conclusion that Petitioner "failed to make a *prima facie* showing of actual innocence to warrant a hearing" is an adjudication of that court, and therefore does not fall under the "clear and

convincing" deference standard of Section 2254(e)(1). See Duncan v. Lee, No. 12 Civ. 2909 (SAS), 2015 WL 4103647, at *6 (S.D.N.Y. July 7, 2015) (noting that state appellate court had found petitioner's claim of actual innocence "unsupported by the record" but still analyzing the evidence under the "more likely than not" standard); Cordero v. Rivera, 677 F. Supp. 2d 684, 690 (S.D.N.Y. 2009) (noting that a state court's finding that a witness was "utterly incredible and unworthy of belief" was a factual determination that deserved a presumption of correctness rather than its decision that the testimony did not establish innocence). By contrast, the state court observed that the New York Court of Appeals had already sustained an earlier finding that Petitioner voluntarily agreed to accompany the police to the police station and that Petitioner's confession was not the product of coercion; these are findings of fact entitled to deference under Section 2254(e)(1). (See Petition, Ex. 4 at 15-16; see People v. Bryant, 80 N.Y.2d 949, 950 (1980).)

The state court made two statements that fall outside 2254(e)(1) deference, however. The state court opinion stated that Petitioner had not established by clear and convincing evidence that "enough B-antigen was present to allow for testing" from the underwear sample, (Petition, Ex. 4 at 15), and

that Tylor's recantation was "highly questionable" and, in combination with Petitioner's other statements from March 28 and 29, 1975, did not amount to clear and convincing evidence to support a claim of actual innocence, (id. at 16-17). These two conclusions were made in the context of the court observing that each did not amount to "clear and convincing evidence" in support of Petitioner's freestanding actual innocence claim. (See id. at 15, 17.) These are legal conclusions not entitled to deference under Section 2254(e)(1). To the extent that such statements could be construed as findings of fact and deserving of deference, it would be irrelevant to the present inquiry, because the proper burden of proof for the instant petition is lower than the state court considered. See Addington v. Texas, 441 U.S. 418, 425 (1979) ("We probably can assume no more than that the difference between a preponderance of the evidence and proof beyond a reasonable doubt probably is better understood than either of them in relation to the intermediate standard of clear and convincing evidence."); Duke Laboratories v. United States, 222 F. Supp. 400, 406 (2d Cir. 1963) ("To establish by a preponderance of the evidence means very simply to prove that something is more likely than not so."); United States v. Polizzi, 545 F. Supp. 2d 270, 278 (E.D.N.Y. 2008) (noting that

"clear and convincing evidence" is "higher than 'more probable than not,' but not as high as 'beyond a reasonable doubt'").

Turning to Petitioner's actual innocence claim, Petitioner has put forward the following new pieces of evidence, in addition to evidence previously presented: additional serological evidence with regard to Petitioner's blood type and two affidavits, one submitted by Kassin and one submitted by now-adult Tylor.

Petitioner's new serological evidence alone is sufficient to meet the credibility prong. As described above, at the time of Petitioner's trial, the sample tested from Smith's underwear had O type blood and only H antigen was present. When Petitioner had his blood type tested in 2010, it was determined that he had B type blood and was a secretor. This is the kind of "exculpatory scientific evidence" that was not present at trial and which amounts to "some new reliable evidence" upon which it is permissible to move onto considering whether the new evidence, when taken together with all available evidence, is compelling. Rivas, 687 F.3d at 541-42; see Ramirez v. Prelesnik, No. 08 Civ. 424 (RJJ), 2009 WL 465622, at *2 (W.D. Mich. Feb. 24, 2009) (noting that new, exonerating DNA evidence could

40

amount to credible evidence supporting an actual innocence claim).

To find Petitioner's evidence "compelling," all the evidence, old and new, when taken together, must show, "more likely than not that no reasonable juror would have convicted" Petitioner; this is a "heavy burden," but "not so heavy as to demand that petitioner show for certain" that he was innocent. Garcia v. Portuondo, 334 F. Supp. 2d 446, 455 (S.D.N.Y. 2004). Petitioner had met this burden.

Petitioner has presented new serological evidence: his blood type. In response to this, both Petitioner and Respondent have also presented new testimonial evidence from two different experts, Shaler and Samples. The testimony of these doctors was taken as part of Petitioner's post-conviction Section 440.10 hearing, already described in part above.

The two experts disagreed about the significance of Petitioner's blood type. Shaler testified that, based on Wiener's notes and testimony, there was significant semen present on Smith's underwear to determine the blood type of the semen donor. Specifically, Shaler pointed to the presence of a

sperm head and the strong reaction of the acid phosphatase test, both of which Wiener had identified, as indications that semen was present in the sample. (See A.1459-60, A.1471-72.) Shaler also noted that Wiener's reports from the time did not include any observations of cells or bacteria corresponding to vaginal secretion or blood, supporting the conclusion that the acid phosphatase reaction was only from semen. (See A.728, A.1460-62; A.1514.) As such, Shaler concluded that the difference between Petitioner's blood type and the blood type found on Smith's underwear, the evidence about which indicated only semen was present, excluded Petitioner as the perpetrator of the crime. (See A.1471.)

Samples disagreed with Shaler's conclusions. Samples testified that a high acid phosphatase reading did not indicate that there is a sufficient amount of sperm present in a sample to evaluate the sperm's blood-typing antigen. (See A.1571.) In Petitioner's case, Samples stated, only observing a single sperm head was the "bare minimum" necessary to say that semen was present in a sample. (A.1572.) Sample also testified that the absence of records indicating Wiener observed cells or bacteria related to vaginal secretion in the sample held no weight, since if Wiener were only looking for sperm, he would not have

42

normally written down "everything." (A.1574, A.1583-84.)
Furthermore, Samples noted that it was unknown whether Smith was
a secretor or not, raising the question of who left the O
antigen on the underwear sample. (See A.1592-93.) The experts
agreed on two points, however: that only having a high acid
phosphatase reading does not necessarily indicate the presence
of high sperm levels, (see A.1459, A.1570), and that if there
was sufficient seminal material present in the underwear sample
to detect antigens, Petitioner would be excluded, (see A.1471-
72, A.1595).


While it is clear that the parties' experts disagree,
ultimately the question of the serological evidence turns on
whether Smith's assailant had a low sperm count or the sample
collected from Smith's underwear had insufficient semen to make
a blood type evaluation. Neither of these have been conclusively
proven by the evidence put forward by Petitioner, but neither
have they been conclusive disproven by Respondent. Moreover,
using the evidence, Samples' analysis is largely based on
assumptions as to what has not been shown, while Shaler's
analysis is based on what has been shown, and it is Respondent
who ultimately had the burden of proof at trial. The prosecution
showed no evidence that Petitioner had a low sperm count, and

Petitioner's evidence, as laid out by Shaler, is compelling proof to support the conclusion that there was sufficient semen to make a proper blood type evaluation, an evaluation that would exclude Petitioner and his B blood type. While by itself such evidence is not sufficient to find compelling evidence of actual innocence, it is a powerful first step towards a preponderance showing when combined with evidence described below.

Petitioner has also put forward an affidavit by Kassin, in which describes risk factors in police interrogations and resultant instances of false confessions. Specifically, Kassin's affidavit identifies several factors that would have made Petitioner vulnerable and likely to falsely confess to the police, including that: Petitioner was eighteen at the time of interrogation, a young age; Petitioner was evaluated as having an I.Q. of 71; the interrogation lasted over half a day without any identified interruptions; the interrogating officers did not permit Petitioner to leave the interrogation room; and Petitioner's confession had factual errors from what the police had determined occurred from crime scene evidence. In sum, Kassin's affidavit observes that 25% of confessions he has reviewed involving DNA evidence exonerations are false. (See A.1277-84.)

For the purpose of an actual innocence claim, such evidence

is able to be considered, regardless of whether foundation has

been established. See Schlup, 513 U.S. at 328 (a court is "not

bound by the rules of admissibility that would govern at trial).

Kassin's observations raise questions about Petitioner's guilt.

For example, a reasonable juror would wonder why Petitioner only

confessed when Brent arrived, and quite suddenly, even after

several hours of professing innocence. While Kassin's affidavit

does not amount to clear and convincing evidence sufficient to

reject the state court's previous finding that Petitioner's

confession was voluntary, see 28 U.S.C. § 2254(e)(1),

voluntariness does not equate with truthfulness, and Kassin's

affidavit raises the specter of falsity as to the content of

Petitioner's confession. Furthermore, given that the state court

on appeal found Petitioner's guilt was "established" on the

basis of Petitioner's confession, (Petition, Ex. 4 at 16), to

undermine Petitioner's confession in turn undermines the

likelihood a reasonable juror would find Petitioner guilty

beyond a reasonable doubt.

Lastly, Petitioner has presented a new affidavit by Tylor

in which Tylor recants portions of his testimony from

Petitioner's original trial. Specifically, Tylor's affidavit states that, unlike his original testimony, on the evening of March 28 he and Smith were standing out his building. Petitioner had walked by the two of them and had asked Smith for some candy; she had declined Petitioner's request. Petitioner then went around the corner. Smith never went around the corner to the convenience store and Petitioner "never followed her." At least half an hour later, Tylor and Smith went inside the building, at which point Tylor states that Smith took the elevator upstairs and Petitioner was not in the area. (See Chamoy Decl., Ex. 27 at ¶¶ 10-14.)

When evaluating witness recantations, they "must be looked upon with the utmost suspicion." Haouari v. United States, 510 F.3d 350, 353 (2d Cir. 2007). However, a court may still consider such testimony "in light of the substance of other evidence, considering the potential motives to be untruthful that the witness may possess, corroboration or the lack thereof, internal consistency, and the inferences or assumptions that crediting particular testimony would require." Lopez, 915 F. Supp. 2d at 405 (quoting Castillo v. Ercole, No. 07 Civ. 11256 (LAP) (GWG), 2009 WL 1492182, at *6 (S.D.N.Y. May 27, 2009))

(accepting recanted statement in consideration of actual innocence claim).

Tylor only recanted his testimony several decades after Petitioner's original trial, and his justification is that he did not know that Petitioner was still alive until reading news about Petitioner's case in the newspaper. (See id. at ¶ 4.) The reasoning of Tylor's recent emergence is admittedly suspect, but that does not sufficiently discredit the statements themselves; put another way, the delay does not undermine Tylor's motivation to be truthful on the matter today, particularly since Tylor, now an adult, represented under oath that he was the one who reached out to Petitioner's counsel. (See id. at ¶ 5.) Tylor's testimony, while not overwhelming persuasive, does poke a meaningful hole in the prosecution's evidence by eliminating the principle eyewitness to see Petitioner and Smith together evening of Smith's death.

Respondent notes that there is still much evidence in support of Petitioner's guilt. In addition to rejecting the significance of the new serological evidence and Tylor's recantation, Respondent points to Petitioner's confession, the testimony about Petitioner's statements to Lapsley and D.

Friedman, the presence of blood on Petitioner's jacket, and that Clark had knowledge of Petitioner having been caught in the past at the location of Smith's murder with similarly-aged young girls. Admittedly, each of these pieces of evidence, if accepted as true, inculpates Petitioner. But much of that same evidence is either tenuous or support countervailing arguments. Petitioner's confession contains many significant incorrect statements of fact, such as what Petitioner claims he did with Smith's body after the attack versus how the body was found by police the following day, and bizarrely omits critical facts about the evening of March 28, such as whether Petitioner sodomized Smith or what Petitioner did during his "black-out" following the attack. Testimonial evidence from Petitioner's stepfather suggested that no phone call with D. Friedman occurred. No blood evidence ever came close to placing Petitioner at the bloody crime scene, a striking fact given the evidence strongly indicated that Petitioner's clothes on March 28 were those he wore the following day, per the police's instructions.

The combination of Petitioner's new evidence does not amount to absolute confidence that Petitioner is innocent. But that is not the standard Petitioner needs to meet to warrant

consideration of his constitutional claim. Rather, Petitioner

needs to show that, with the evidence presented, it is more

probable than not that "reasonable, properly instructed jurors"

would not believe him guilty beyond a reasonable doubt. Schlup,

513 U.S. at 329. Here, the serological evidence in combination

with other presented evidence establishes a credible and

compelling claim of actual innocence, and faced with such it is

more likely than not that a reasonable juror would have

reasonable doubt about Petitioner's guilt. See Letemps v. Sec'y,

Florida Dep't of Corr., 114 F. Supp. 3d 1216, 1226 (M.D. Fla.

2015) (finding "sufficient doubt" raised to support actual

innocence claim after new serological and eyewitness evidence

presented). Petitioner's preponderance showing of reasonable

doubt established, the merits of Petitioner's constitutional

claim will be considered, even in the face of his untimely

petition. Rivas, 687 F.3d at 518.

## The State Court Decision That Petitioner Received Effective Assistance Of Counsel Was An Unreasonable Application Of *Strickland v. Washington*

Petitioner contends that he received ineffective assistance

of counsel in violation of the Sixth and Fourteenth Amendments

because his trial counsel failed to consult a serology expert

and to test Petitioner's blood type and secretor status. The New

York State First Department has previously found that Petitioner's trial counsel's actions did not amount to ineffective assistance of counsel. See People v. Bryant, 118 A.D.3d 576, 988 N.Y.S.2d 175 (1st Dep't 2014). As Petitioner disputes the state court's application of law, Petitioner can prevail only if he can establish that the state court's determination was "was contrary to, or involved an unreasonable application of" Strickland v. Washington. 28 U.S.C. § 2254(d)(1).

Under Strickland, a petitioner must satisfy a two-part test to establish that his Sixth Amendment right to effective assistance of counsel has been violated. A petitioner must show (1) that counsel's representation fell below an objective standard of reasonableness; and (2) that the deficient performance of counsel prejudiced the defense. See Henry v. Poole, 409 F.3d 48, 63 (2d Cir. 2005) (quoting Strickland, 466 U.S. at 687-88).

For Strickland's first prong, objective reasonableness, a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption

that, under the circumstances, the challenged action might be considered sound trial strategy." Strickland, 466 U.S. at 689 (citation and internal quotation marks omitted); see also United States v. Best, 219 F.3d 192, 201 (2d Cir. 2001) ("Actions or omissions [by counsel] that might be considered sound trial strategy do not constitute ineffective assistance."). A strategic decision is a "conscious, reasonably informed decision made by an attorney with an eye to benefitting his client." Cox v. Donnelly, 387 F.3d 193, 198 (2d Cir. 2004).

As to Strickland's second prong, prejudice, a petitioner must demonstrate that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. To satisfy the reasonable probability test, "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome of the case." Henry, 409 F.3d at 63 (emphasis in original) (citing Strickland, 466 U.S. at 693). "The level of prejudice that [a petitioner] need demonstrate lies between prejudice that had some conceivable effect and prejudice that more likely than not altered the outcome in the case." Lindstadt v. Keane, 239 F.3d 191, 204 (2d Cir. 2001) (internal quotation marks omitted). "The result of a proceeding

can be rendered unreliable, and hence the proceeding itself unfair, <u>even if the errors of counsel cannot be shown by a preponderance</u> of the evidence to have determined the outcome." <u>Henry</u>, 409 F.3d at 64 (emphasis in original) (citing <u>Strickland</u>, 466 U.S. at 694).

The Court has noted that under Section 2254(d)(1), "an <u>unreasonable</u> applicable of federal law is different from an <u>incorrect</u> application of federal law." <u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011) (citation omitted) (emphasis in original). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." <u>Id.</u> (citing <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004)).

In considering Petitioner's claim, the First Department reviewed, amongst other things, the trial record and testimony from Auerbach as to his approach to using of serological evidence at the time of Petitioner's trial. The state court concluded that trial counsel's "inability to recall his reasons for not consulting a serologist or having [petitioner's] blood type tested did not establish that such actions were not rooted

in strategic considerations." Bryant, 118 A.D.3d at 577.
Furthermore, the court reasoned that Auerbach's representation
was not constitutionally ineffective because "the serology
expert could not connect any of the physical evidence to
defendant, and counsel relied upon such testimony in arguing
defendant's innocence." Id. Both conclusions are unreasonable
under Strickland.

Looking to Strickland's first prong, the state court was
incorrect when it determined that trial counsel's actions did
not fall below objective reasonableness. Strickland, 466 U.S. at
687. First, contrary to the state court's conclusion, the facts
do not reasonably establish that Auerbach's decision were based
on strategy. Rather, Auerbach's testimony as to not consulting a
serologist is unequivocal: when asked if there was a reason he
did not order any tests, he replied, "No." (A.1750.)
Furthermore, Auerbach testified that he "never considered
retaining a serologist," (A.1752), and stated plainly that it
was not part of a "grand trial strategy." (A.1752-53.) The fact
that, when first approached about the instant matter, Auerbach
did not have an "independent recollection" of the case dating
back several decades, (A.1755), does not detract from the
clarity of his post-reflection answers given under oath as to

his lack of serological strategy and the admission that using serological evidence was not on his "radar" at the time of Petitioner's trial. (A.1752.) As such, Auerbach's failure to learn about and analyze the serological evidence being put forward by the prosecution was not part of a trial strategy.

Auerbach's failure to do so was objectively unreasonable. Auerbach was aware that both Smith and the sample found on Smith's underwear had tested positive for O blood types. He knew that the prosecution was going to call a serological expert to testify. In the face of this presentation, Auerbach did not know what blood type Petitioner was and did not endeavor to determine it, and there was no strategic reason not to do so. Had Auerbach conducted a test to determine Petitioner's blood type and discovered, hypothetically, that Petitioner's blood type was type O blood and that he was a secretor, such results would not have been admissible under New York court precedent at the time given the O blood type's statistical commonality amongst the population in the United States.[9] See People v. Robinson, 27

_____

[9]     In the United States, the general population has the following blood type distribution: 48% of people have type O blood, 36% have type A blood, 11% have type B blood, and 5% have type AB blood. See AM. ASS'N OF BLOOD BANKS BLOOD FAQ, http://www.aabb.org/tm/Pages/bloodfaq.aspx (last visited July 28, 2017). It is generally proper and within a district court's discretion "to take judicial notice of articles and Web sites

N.Y.2d 864, 865, 265 N.E.2d 543, 543 (1970) ("Proof that

defendant had type 'A' blood and that the semen found in and on

the body of decedent was derived from a man with type 'A' blood

was of no probative value in the case against defendant in view

of the large proportion of the general population having blood

of this type and, therefore, should not have been admitted.")[10]

Knowing that serological evidence would be presented at trial,

an objectively reasonable attorney would have, at minimum,

investigated that a line of defense that "posed no risk to

[Petitioner's] defense, but the potential benefit [of which] was

enormous." Duncan v. Ornoski, 528 F.3d 1222, 1236 (9th Cir.

published on the Internet." Patsy's Italian Restaurant, Inc. v.
Banas, 575 F. Supp. 2d 427, 443 n.18 (E.D.N.Y. 2008), aff'd, 658
F.3d 254 (2d Cir. 2011).

[10]    Respondent argues that Robinson's statement about the
admissibility of blood tests was dictum and, therefore, not
controlling authority at the time of Petitioner's trial. Post-
Robinson New York State decisions, including from the New York
Court of Appeals itself, indicate otherwise. See Matter of Abe
A., 56 N.Y.2d 288, 299 n.4 (1982) (citing Robinson as support
without much elaboration); People v. Macedonio, 42 N.Y.2d 944
(1977) (same); see also People v. Mountain, 66 N.Y.2d 197, 201
(1985) (overturning Robinson and referring to Robinson's
decision as a "rule"). Respondent's use of the New York Second
Department's holding in People v. Macedonio, 53 A.D.2d 809 (2d
Dep't), is unavailing, particularly in light of its later
reversal. The Court of Appeals overturned the decision of the
lower state court which had improperly affirmed the admission of
a defendant's type A blood as proof. See Macedonio, 42 N.Y.2d at
944. That a lower court's reading of a higher court's decision
that was later reversed does not indicate that the higher
court's opinion was not, and was not considered, binding
authority at the time; if anything, it indicates the opposite.

2008) (finding <u>Strickland</u> violation for defense attorney's failure to test client's blood type).

The potential benefit to Petitioner's case is, had Petitioner's blood type been discovered not to be type O blood, but rather, for example, the type B blood that Petitioner actually is, such a fact would have severely undermined the prosecution's case. Establishing different blood types would have made it a "simple inference for the jury to draw (and an easy argument for petitioner's counsel to make)" that petitioner was not the perpetrator. <u>Dorsey v. Kelly</u>, No. 92 Civ. 8943 (LLS), 1997 WL 400211, at *5 (S.D.N.Y. July 16, 1997) (granting habeas petition for failing to get serological evidence admitted), <u>aff'd sub nom.</u> <u>Dorsey v. People</u>, 164 F.3d 617 (2d Cir. 1998). Given the circumstances, Auerbach's decision was not one that a reasonable attorney would have made, and the state court was incorrect in determining otherwise. <u>Contra</u> <u>Harrington</u>, 562 U.S. at 108 (accepting as reasonable strategy a defense attorney's decision not to have his client's blood tested because of risk that if "serological analysis or other forensic evidence demonstrated that the blood came from [defendant] alone, [defendant's] story would be exposed as an invention").

Similar reasons undergird why Auerbach's unreasonable choice meets <u>Strickland</u>'s prejudice prong. Without consulting a serologist and appreciating the difference between Petitioner's blood type and the blood type found on the underwear sample, Auerbach's cross-examination of Wiener, while in other respects adequate, did not—and, moreover, could not—focus on antigens, other than simply to ask Wiener whether blood types like A, B, and O existed and whether there was a blood type called H. (<u>See</u> A.727.) Without knowing about the blood type difference, Auerbach did not discuss those differences or present its significance to the jury. Had Auerbach investigated the serological evidence further, he "would have understood [its] importance" for Petitioner's defense, but his failure to do so resulted in an inadequate cross-examination of the prosecution's presentation of said evidence and inadequate defense of his client. <u>Duncan</u>, 528 F.3d at 1242.

While Petitioner's blood type evidence would not have been conclusively exculpatory, it, nevertheless, would have been significant. It would have made it substantively more difficult for the prosecution to place Petitioner at the crime scene. It would have forced the prosecution to have to argue that even though the blood type between the sample and Petitioner

differed, heavily suggesting that Petitioner was not the perpetrator and itself a "straightforward and powerful argument," that such a fact should not matter because it is possible there was not enough semen present to accurately test for B blood types—a "more strained [argument]." Dorsey, 1997 WL 400211, at *5. The remaining evidence presented—Petitioner's contested confession at the police station, the testimony that Petitioner had in times past been on the sixteenth floor landing, Petitioner's statements to female friends—was not so "overwhelming that [Petitioner's] counsel's error does not undermine confidence in the verdict." Id., 1997 WL 400211, at *9. It would have cast doubt on Petitioner's entire confession, which at the time of trial Petitioner argued and testified was coerced. It would have strongly supported the conclusion that the prosecution had not met its burden in proving Petitioner's guilt.

Petitioner has established by a "reasonable probability" that "absent the errors, the factfinder would have had a reasonable doubt respecting guilt," which is "a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. It is the kind of "single, serious error" that can support a claim of ineffective assistance of counsel.

*Kimmelman v. Morrison*, 477 U.S. 265, 383 (1986). It is the kind that entitles Petitioner to relief under a writ of habeas corpus.

**Conclusion**

Petitioner's actual innocence claim is not barred by the applicable statute of limitations. A constitutional claim of ineffective assistance of counsel has been established. A writ of habeas corpus will issue.

Respondent is directed to release Petitioner within 45 days of the date of this opinion, unless the state declares its intention, within those 45 days, to retry Petitioner on the charges against him.

The Clerk of Court is respectfully requested to close this case.

It is so ordered.

**New York, NY**
**August 3, 2017**

ROBERT W. SWEET
U.S.D.J.